# EXHIBIT A

BRAZZANO LAW PLLC
Rebecca Brazzano, Esq.
ID No.: 025412003
43 West 43rd Street, Suite 264
New York, New York 10036
(561) 685-3812
*Attorneys for Plaintiff*

| | |
|---|---|
| Teresia Bost,<br><br>                Plaintiff,<br><br>-- against --<br><br><br>Ron Chiarello, Tobi Oke, Jenny Yip, Patrice Milos, Yassine Oussaifi and 54gene, Inc.,<br><br>            Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: HUNTERDON COUNTY<br><br>**DOCKET NO.:**<br><br>CIVIL ACTION<br><br><br>**VERIFIED COMPLAINT AND JURY DEMAND** |

Plaintiff, Teresia Bost ("Plaintiff" or "Ms. Bost") by and through her counsel of record, Rebecca Brazzano, Brazzano Law PLLC, 43 West 43rd Street, Suite 264, New York New York 10036 for her Verified Complaint against the Defendants, Ron Chiarello ("Chiarello"), Tobi Oke ("Oke"), Jenny Yip ("Yip"), Patrice Milos ("Milos"), Yassine Oussaifi ("Oussaifi", collectively the "Individual Defendants") and 54gene, Inc. ("54gene", collectively with the Individual Defendants, "Defendants") alleges as follows:

<u>STATEMENT OF THE CASE</u>

1.       This is a case about pervasive, repetitive, unlawful, hostile and discriminatory behavior directed specifically towards Plaintiff, the only woman of color of African descent in the United States based C-Suite.  This is a case about a company and its executives that believe they are not required to abide by the laws of New Jersey that govern and protect employees from unlawful and discriminatory conduct.  A company that cloaks itself in an external African focused mission, yet unlawfully mistreats and harasses its only United States based woman of

color and African descent on its executive management team. A company that knows of biased treatment, menacing intimidation, and a venomous work environment that its singular Black skinned woman executive suffered, coupled with its intentional and hollow silence. A company that literally ignores outrageous mistreatment and hostile working environment and tolerates yelling tantrums which shatter and shred an individual's fundamental identity. A company that disrespects an employee's core racial being and that does not investigate or punish its very own executive harasser, but instead invites him to pull up a chair to their coveted executive table. A company that is now guided by a chauvinistic, bigoted, and sexist executive leadership. The company, 54gene (inclusive of its Board of Directors and Supervisory Committee), and its cohorts, Chiarello, Oke, Yip, Milos, and Oussaifi individually, each of whom actively participated, silently supported, or failed to act, all engaged in the unlawful conduct as alleged herein by Plaintiff.

2.      The Defendants have all violated Plaintiff's fundamental right to work in an environment that is free from their unlawful discrimination and the imposition of their newly minted selective white sovereignty reboot.

3.      For a company whose genesis began with African and Black leadership, that was focused on "pioneering the inclusion of the African genome in research," the Defendants' unlawful behavior here confirms there is a total mission failure.

4.      The discriminatory conduct at issue here created a poisonous work environment that stripped Plaintiff of her dignity, her voice, her power and resulted in repeated and intentional infliction of emotional turmoil and distress which required acute medical treatment.

5.      The Defendants' unlawful conduct included purposeful humiliation, belittlement, false criticism, threatening conduct and abusive discrimination.

6.     54gene and each of Chiarello, Oke, Yip, Milos and Oussaifi, were on actual notice of Plaintiff's multilayered protected status as a woman of color, of African descent, who is over the age of forty (40), of the unlawful behavior, and each failed to thoroughly investigate or follow the internal policies and/or protocol concerning Plaintiff's specific complaints of discrimination and harassment.

7.     When Plaintiff interviewed with the African founder of 54gene, and later excitedly accepted her position as General Counsel, she was driven by a deep sense of commitment to the mission and a fervent desire for positive change.

8.     Plaintiff wholeheartedly embraced 54gene's then mission's objective: to map African ancestral data in order to tackle diseases that affect communities around the world.

9.     Plaintiff's excitement stemmed from the profound impact this work could have on improving global health equity.

10.     The Defendants here made sure that Plaintiff's excitement was extinguished, her sense of self-worth was trampled upon and her goal of positive change upon the African continent was apathetically cancelled.

11.     The unlawful experiences Plaintiff was subjected to during her employment at 54gene on a daily basis for months left her with a daunting decision to make, a decision that women should not have to make: continue to endure the known ongoing discrimination and abusive harassment or courageously raise her voice to protect her physical, mental, and professional well-being.  Plaintiff rightly chose the latter.

12.     It is disturbing and equally pathetic that in 2023, Plaintiff still must prove she is as equally qualified as a man, that she was unaided by superior positioned women who could have engaged and made the unlawful conduct stop, but instead did nothing, or that being a

professional female attorney at law did not shield Plaintiff from unlawful discrimination.  The #MeToo movement has elevated the voices of many but has left silenced the female attorneys like Plaintiff who suffer under its shadow.

13.     Plaintiff's understandable hesitance in seeking accountability from the Defendants was well-founded, her voice was met with a shameful and vicious onslaught from the Defendants, they callously wielded false and defamatory accusations and their representative counsel inquired cynically how Plaintiff would secure future employment if she dared to publicly assert her claim.

14.     As 54gene's former General Counsel, Plaintiff is acutely aware of the inherent risk to her professional reputation, and her career's trajectory, in bringing the instant action, including Defendants' retaliatory false threats hurled against her if she dared to seek the protections afforded under governing New Jersey law.

15.     Plaintiff is likewise aware that as soon as there is a whiff of discriminatory conduct, companies like 54gene and their complicit executives circle the proverbial wagons to create a flak jacket deflecting any ownership or responsibility over the unlawful conduct.  In the shadows of silence, injustice thrives, but the Defendants' reach to silence Plaintiff through threats and intimidation only serve to highlight their sheer futility.

16.     The now single hued white US leadership flips the narrative to disparage and discredit Plaintiff with scurrilous and injuries accusations to signal their ruinous playbook to intimidate and silence her voice against them.

17.     Plaintiff will not succumb to their threatening tactics, for her unwavering resolve illuminates the darkness, ensuring that Defendants are in fact held accountable.

18.     Plaintiff is tired of carrying her female Blackness as if they are her weighted

albatross, she is physically and mentally drained as a result of Defendants' unchecked unlawful

actions, but she will not be muzzled by their hollow threats.

19.     Defendants here permitted the unlawful and discriminatory conduct to continue,

and by their silence, promoted it.

20.     Defendants here allowed the continuous unlawful conduct, directed at Plaintiff in

New Jersey and thereby encouraged it.

21.     Defendants' actions, and inaction, confirm that they condoned the unlawful and

harmful conduct inflicted upon Plaintiff and now they must own the consequences of their own

failures.

22.     Defendants' attempt to cloak themselves under the guise of an African ventured

operation, while they actively cleanse the United States C-Suite of the only Black skinned

African woman, is demonstrative of their miserable and unlawful conduct.

<u>*THE PARTIES AND VENUE*</u>

23.     Plaintiff is an individual residing at 123 Readington Road, Whitehouse Station,

New Jersey 08889, in the County of Hunterdon, State of New Jersey.  At all relevant times,

Plaintiff has maintained her residency in the State of New Jersey and the causes of action herein

caused harm to Plaintiff in this venue.

<u>*THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER EACH NAMED DEFENDANT*</u>

<u>*DEFENDANT CHIARELLO*</u>

24.     Upon information and belief, Chiarello is a resident of the State of California,

with his primary residence at 390 Elizabeth Street, San Francisco, California or 27 Donna Maria

Way, Orinda, California.

25.     Chiarello specifically directed his unlawful activities into the State of New Jersey

by, amongst other conduct, he directed a false and disparate review of Plaintiff's cooperativeness knowing Plaintiff would read the false communication in New Jersey, Chiarello interacted with Plaintiff on a regular basis, using electronic mail, telephone calls, and text messages, knowing all of those communications would be received by, and/or read by, Plaintiff in New Jersey, Chiarello participated in meetings with Plaintiff knowing she was in New Jersey, Chiarello received complaints from Plaintiff from New Jersey about the unlawful harassment by Oke, Chiarello's communications at issue here were expected and/or intended to cause injury in New Jersey and Chiarello had the knowledge and/or purpose of causing harm to Plaintiff in New Jersey.

26.     Chiarello knew, and purposefully concealed, his knowledge that Plaintiff was the unlawful subject of harassing, discriminatory, disparate and hostile treatment, in his desperate reach to be the solo-Chief Executive Officer, he used that knowledge to further injure, ostracize and falsely accuse Plaintiff of imaginary performance deficiencies, knowing that his scheme exposed 54gene to liability in the State of New Jersey, as that is where the injury was expected and/or intended and/or ongoing.

27.     Chiarello knew that his failure to investigate Plaintiff's complaints of harassing, discriminatory, disparate and hostile treatment, or to make them stop, violated his fiduciary duties to 54gene, and that the allegations here exposed both 54gene and Chiarello to liability in the State of New Jersey, as that is where the injury was expected and/or intended and/or ongoing.

28.     Further, Chiarello is now engaged in LinkedIn stalking of Plaintiff, including excessively and intrusively monitoring Plaintiff's LinkedIn profile and activities without her consent.

29.     Upon information and belief, Chiarello, in a lame disguise, identifying himself as an "Executive Director in the Professional Training and Coaching Industry From San Francisco

Bay Area," has repeatedly visited Plaintiff's profile, scrutinizing her connections, posts, endorsements, and other publicly available information on the platform.

30.     Upon information and belief, Chiarello is repeatedly viewing Plaintiff's profile with malicious intent, including gathering personal information, tracking professional movements, and thus engaging in online harassment.

31.     LinkedIn stalking is considered a violation of normal privacy boundaries.

32.     Chiarello's purposeful overreach is creepy, and it disregards Plaintiff's rights to control the visibility of her professional information and he has created an uncomfortable and unsafe online environment.

33.     This Court has specific jurisdiction over Chiarello as a result of his purposeful activities directed at Plaintiff in this forum and pursuant to Rule 4:4-4, et seq.

*DEFENDANT OKE*

34.     Upon information and belief, Oke is a citizen of the Federal Republic of Nigeria ("Nigeria"), is the Managing Partner of V8 Capital Partner, which holds some portion of 54gene's Series A investment funding in the amount of $15 million dollars, Oke, at the time of his actions, was an official member of 54gene's Board of Directors and was also an unofficial member of 54gene's Supervisory Committee, which directs all of 54gene executive level decisions.

35.     Oke specifically directed his unlawful harassing, discriminatory, disparate and hostile treatment of Plaintiff, including his repeated telephonic rampages and screeching temper tantrums activities into the State of New Jersey by, amongst other conduct, targeting Plaintiff and creating a hostile working environment for Plaintiff in New Jersey by repeatedly shrieking and screaming at Plaintiff on Zoom and Google meetings and telephone conferences knowing that

Plaintiff was in New Jersey, degraded, humiliated and berated Plaintiff with derogatory and demeaning directives, falsely critiqued Plaintiff's work product and criticized Plaintiff's legal work product and ability. Oke did not treat the other women in the C-Suite or the men in the C-Suite (or the Board of Directors or Supervisory Committee) with such unlawful treatment, Oke reserved and directed all of his unlawful and hatred conduct toward Plaintiff.

36.     Oke interacted with Plaintiff on a regular basis, using electronic mail, telephone calls, text messages and Zoom and Google meetings, knowing all of those communications would be received by, and/or read by, Plaintiff in New Jersey.

37.     Oke misused his superior position over Plaintiff to intimidate her and instill fear in Plaintiff while falsely accusing her of being incompetent in front of others knowing Plaintiff would be harmed in New Jersey.

38.     Oke, upon information and belief, was informed of Plaintiff's complaints about his outrageous harassment of Plaintiff and punished and retaliated against Plaintiff rendering her work environment unbearable, all while knowing that the harm he was directing at Plaintiff was causing harm in the State of New Jersey.

39.     Oke's harassing, discriminatory, disparate and hostile treatment of Plaintiff as alleged herein was expected and/or intended to and did cause injury to Plaintiff in New Jersey.

40.     Oke had the knowledge and/or purpose of causing harm to Plaintiff in New Jersey.

41.     Oke knew that his purposeful harassing, discriminatory, disparate and hostile treatment of Plaintiff violated his fiduciary duties to 54gene, and that the allegations here exposed both 54gene and Oke to liability in the State of New Jersey, as that is where the injury was expected and/or intended and/or ongoing.

42.     This Court has specific jurisdiction over Oke as a result of his purposeful activities directed at Plaintiff in this forum and pursuant to Rule 4:4-4, et seq.

*DEFENDANT YIP*

43.     Upon information and belief, Yip is a resident of California, with a primary address at 125 Mountain Spring Avenue, San Francisco, California, is a Managing Partner at Adjuvant Capital which holds a majority portion of 54gene's Series A and B investment funding in the amount of more than $20 million dollars (and who is primarily funded by Merck, Novartis, IFC, Bill & Melinda Gates Foundation, Children's Investment Fund Foundation, Dalio Philanthropies, Doris Duke Charitable Foundation, ELMA Investments Ltd., Ford Foundation, MacArthur Foundation, Global Health Investment Corporation, CDC Group, and Anthos Fund & Asset Management), Yip is on the Board of Directors of 54gene, is the Chair of the Board of Directors as well as of the 54gene Supervisory Committee, which directs all of 54gene's executive level decisions.

44.     Further, and upon information and belief, as Adjuvant is one of 54gene's primary investors, it maintains the right to invite one or more other members of its funds to attend both Board of Director meetings and Supervisory Committee meetings as observers, giving it more significant oversight based upon the significance of its investment in 54gene.

45.     Yip was specifically informed by Plaintiff from New Jersey of the harassing, discriminatory, disparate and hostile treatment exacted upon her by Oke and was present on multiple telephone calls and video meetings wherein Oke berated, humiliated and falsely criticized Plaintiff in New Jersey.

46.     Yip regularly communicated with Plaintiff knowing such communications would be received and read by Plaintiff in New Jersey, Yip knowingly interacted with Plaintiff on a

regular basis, using electronic mail, telephone calls, text messages and Zoom meetings, knowing all of those communications would be received by, and/or read by, Plaintiff in New Jersey.

47.     Upon receiving Plaintiff complaints concerning Oke's harassing, discriminatory, disparate and hostile treatment, Yip used her superior position over Plaintiff to dissuade her in any further complaints, but instead demanded that Plaintiff continue to subject herself to Oke's abuse in attending further meetings where Oke could further target Plaintiff.

48.     Yip did nothing to shield Plaintiff, nothing to investigate and nothing to stop the unlawful behavior, all while Yip knew Plaintiff was suffering in New Jersey.

49.     Yip knew that the harm directed at Plaintiff was causing harm in the State of New Jersey.

50.     Yip knew that her failure to investigate Plaintiff's complaints of harassing, discriminatory, disparate and hostile treatment, or to make them stop, violated her fiduciary duties to 54gene, and that the allegations here exposed both 54gene and Yip to liability in the State of New Jersey, as that is where the injury was expected and/or intended and/or ongoing.

51.     Yip had the knowledge and/or purpose of causing harm to Plaintiff in New Jersey.

52.     This Court has specific jurisdiction over Yip as a result of her purposeful activities directed at Plaintiff in this forum and pursuant to Rule 4:4-4, et seq.

*DEFENDANT MILOS*

53.     Upon information and belief, Patrice M. Milos is a resident of Rhode Island, with a primary residence at 140 Shaw Ave, Providence, Rhode Island, is a Vice President of Scientific Operations, and is an Independent Director of 54gene and a Member of its Supervisory Committee, which directs all of 54gene's executive level decisions.

54.     Milos holds herself out to the public as "Board Member at 54gene" on LinkedIn.

55.     Milos was specifically informed by Plaintiff from New Jersey of the harassing, discriminatory, disparate and hostile treatment inflicted upon Plaintiff by Oke and was present on numerous telephone calls and video meetings wherein Oke berated, humiliated and falsely criticized Plaintiff in New Jersey.

56.     Milos knowingly interacted and communicated with Plaintiff on a regular basis, using electronic mail, telephone calls, text messages and Zoom meetings, knowing such communications would be received by, and/or read by, Plaintiff in New Jersey.

57.     Milos provided advice and counsel to Plaintiff, including at one point apologizing to Plaintiff for having put Plaintiff in the position to be targeted by Oke's harassing, discriminatory, disparate and hostile treatment, knowing that her advice was provided to and received by Plaintiff in New Jersey.

58.     Milos knew that the harm directed at Plaintiff was causing harm in the State of New Jersey.

59.     Milos knew that her failure, as 54gene's only independent member of its Supervisory Committee, to investigate Plaintiff's complaints of harassing, discriminatory, disparate and hostile treatment, or to make them stop, violated her fiduciary duties to 54gene, and that the allegations here exposed both 54gene and Milos to liability in the State of  New Jersey, as that is where the injury was expected and/or intended and/or ongoing.

60.     Milos had the knowledge and/or purpose of causing harm to Plaintiff in New Jersey.

61.     This Court has specific jurisdiction over Milos as a result of her purposeful activities directed at Plaintiff in this forum and pursuant to Rule 4:4-4, et seq.

*DEFENDANT OUSSAIFI*

62.     Upon information and belief, Oussaifi is a citizen of the Republic of Tunisia ("Tunisia"), is a partner at Cathay AfricInvest Innovation Fund ("CAIF") (who was the lead investors in 54gene's securement of Series B round of funding in the approximate amount of $25M) and is a Member of the 54gene's Board of Directors and Supervisory Committee, which directs all of 54gene's executive level decisions.

63.     Further, and upon information and belief, as CAIF is one of 54gene's primary investors, it maintains the right to invite one or more other members of its funds to attend both Board of Director meetings and Supervisory Committee meetings as observers, giving it more significant oversight based upon the significance of its investment in 54gene.

64.     Oussaifi was specifically informed of the harassing, discriminatory, disparate and hostile treatment inflicted upon Plaintiff by Oke and was present on numerous telephone calls and video meetings wherein Oke berated, humiliated and falsely criticized Plaintiff in New Jersey.

65.     Oussaifi knowingly interacted and communicated with Plaintiff on a regular basis, using electronic mail, telephone calls, text messages and Zoom meetings, knowing all of those communications would be received by, and/or read by, Plaintiff in New Jersey.

66.     Oussaifi knew that the harm directed at Plaintiff was causing harm in the State of New Jersey.

67.     Oussaifi knew that his failure to investigate Plaintiff's complaints of harassing, discriminatory, disparate and hostile treatment, or to make them stop, violated his fiduciary duties to 54gene, and that the allegations here exposed both 54gene and Oussaifi to liability in the State of New Jersey, as that is where the injury was expected and/or intended and/or ongoing.

68.     Oussaifi had the knowledge and/or purpose of causing harm to Plaintiff in New Jersey.

69.     This Court has specific jurisdiction over Oussaifi as a result of his purposeful activities directed at Plaintiff in this forum and pursuant to Rule 4:4-4, et seq.

### DEFENDANT 54GENE

70.     The Defendant, 54gene Inc., upon information and belief, is a foreign corporation, incorporated in the State of Delaware, with its principal headquarters located in the District of Columbia at 1717 K Street NW, Suite 900, Washington, DC 20006.

71.     54gene employed Plaintiff in Whitehouse Station, State of New Jersey, paid New Jersey State income taxes on behalf of Plaintiff to the New Jersey taxing authority, provided health insurance coverage to Plaintiff in New Jersey, maintained a 401K plan that provided benefits to Plaintiff in New Jersey, the actionable unlawful mistreatment at issue in this case was expected and intended to cause injury to Plaintiff in New Jersey, and 54gene did so with knowledge and/or purpose of causing harm to Plaintiff in the State of New Jersey.

72.     54gene purposefully availed itself of this State's laws and purposefully directed activities toward the State by initially interviewing Plaintiff remotely knowing she was in New Jersey, it hired Plaintiff knowing that she resided in New Jersey, and knowingly conducting its business through Plaintiff's approved workstation in Whitehouse Station, New Jersey.

73.     When Plaintiff had to travel outside of New Jersey, to 54gene's Washington, D.C.'s offices or to the continent of Africa, 54gene preapproved all of her travel originating in New Jersey and reimbursed her for same.

74.     Further, 54gene further availed itself to the laws of the State of New Jersey by using Plaintiff's New Jersey Bar License in its business communications, in representations to its

investors and even after her departure, on its website, www.54gene.com.

75.     It was only after Plaintiff made multiple demands that 54gene finally removed Plaintiff's credentials from its website, wherein it was then falsely representing that Plaintiff, as a licensed attorney, was still part of 54gene's executive management team.

76.     This Court has specific jurisdiction over 54gene as a result of its purposeful activities directed at Plaintiff in this forum and pursuant to Rule 4:4-4 et seq.

77.     Further, after Plaintiff was forced to resign and she advised the Defendants of her claims here, each of them authorized their Nigerian counsel, Alma Karibo, who is not admitted to any State Bar in the United States, to publish and send Plaintiff's counsel a letter on May 5, 2023 wherein they all retaliated against Plaintiff, disparaged, defamed and maligned her personal character, with false statements that sought to instill fear in Plaintiff and impact her professional license to practice law, all in an effort to coercively silence Plaintiff (the "May 5 Defamatory Letter").

78.     Ms. Karibo copied the defamatory correspondence inside 54gene, copying ron.chiarello@54gene.com, and unlawfully published that same correspondence outside of 54gene, by copying tobi@v8cappartners.com, jy@adjuvantcapital.com, patricemilos06@gmail.com, yassine.oussaifi@africinvest.com, abasieneobong@gmail.com; and funmi.olopade@gmail.com, all of which are non @54gene.com email addresses.

79.     This correspondence was sent to Plaintiff's counsel, knowing that Plaintiff would receive it and read it in New Jersey.

80.     The correspondence was not on company letter head, did not cite either New Jersey Rule of Evidence, Rule 403, or the corresponding Federal Rules of Evidence, Rule 408.

81.     The May 5 Defamatory Letter was authored in Nigeria, and upon information and

belief, Nigeria does not recognize the privilege associated with litigation, known in the United States as the litigation privilege.

82.     As such, the defamatory statements contained in the May 5 Defamatory Letter are not subject to any recognized litigation privilege.

83.     Further, any claimed litigation privilege was waived by 54gene's sending the defamatory statement beyond the parties to the instant lawsuit, and to email addresses outside of @54gene.com.

84.     Plaintiff specifically alleges that Defendants' May 5 Defamatory Letter was in retaliation for her prior accusations and complaints of harassing, discriminatory, disparate and hostile treatment by Oke.

85.     Plaintiff avers that Defendants' ulterior motive for the May 5 Defamatory Letter her was to threaten, intimidate and silence her.

86.     54gene, upon information and belief, with drafting assistance and final approval from the Individual Defendants, published the defamatory statements beyond just Plaintiff's attorney, and beyond email addresses associated with 54gene, but instead to email addresses and domains controlled by third parties, including but not limited to tobi@v8cappartners.com, jy@adjuvantcapital.com, patricemilos06@gmail.com, yassine.oussaifi@africinvest.com, abasieneobong@gmail.com; and funmi.olopade@gmail.com.

87.     The inclusion of non-@54gene.com email addresses constitutes unlawful publication, and specifically waives any purported claim that the defamatory statements are cloaked behind the litigation privilege or any other recognized privilege.

88.     The May 5 Defamatory Letter was not on company letterhead, was authored in Nigeria, and was sent from a foreign lawyer, unlicensed in the United States, and none of the

attorney privilege protections apply thereto.

89.     The statements made by 54gene's foreign lawyer, sanctioned by the Individual

Defendants, were not material or pertinent to the issue to be resolved by Plaintiff's claims

sounding in harassing, discriminatory, disparate and hostile treatment.

90.     Instead the Defendants made the false statements with malice aforethought to

instill fear and threaten Plaintiff that if she proceeds in filing a formal public facing proceeding,

she will suffer their false consequence.

91.     The May 5 Defamatory Letter includes false and derogatory statements, that were

known by the Defendants to be false at the time they were written, including the following: (i)

the Plaintiff was connected to 54gene's "mismanagement and misappropriation of funds," a

statement that is false, defamatory and contrary to the third party audit report that was conducted

that specifically found that Plaintiff had no knowledge or involvement in a predecessor

executive's alleged misconduct; (ii) that "unauthorized bonus payments above [Plaintiff's]

contracted bonus amounts were made to herself and other members of the Csuite;" despite

knowledge that such statement is false, defamatory and that the bonuses to which 54gene's

foreign counsel refers were not approved or authorized by Plaintiff, but instead by the

predecessor executives to whom Plaintiff then reported; (iii) allegations that Plaintiff "also

approved the unauthorized investment of One Hundred Thousand US Dollars of funds" into a

particular venture, knowing that statement is false, defamatory and demonstrably false as the

transaction in question was approved by Plaintiff's predecessor.

92.     It is unfortunate that 54gene's foreign counsel, who signed the May 5 Defamatory

Letter in Nigeria, is fully aware that it contains false statements, having firsthand knowledge of

the unlawful conduct alleged in this Complaint, yet she jumped into the role of "General

Counsel" after Plaintiff was constructively discharged, without a license to practice law in the United States.

93.     Foreign Counsel's prioritization of retaining her job with a discriminatory entity, 54gene, and its Ivory Tower of executives, over truth (as she was in fact privy to the unlawful conduct alleged), is wretched and purposefully deceptive.

94.     Foreign Counsel is just another disgraceful example where a woman was (and is) in the position to assist Plaintiff and stand up for known discrimination, but instead does nothing, joining Yip and Milos with a front row seat on the bleachers of shame.

95.     All of the Defendants are subject to the specific jurisdiction of this Court.

96.     Venue is properly laid in Hunterdon County pursuant to R. 4:3-2 as it is where the cause of action arose, the county in which Plaintiff resides at the time of commencement, and the county in which Defendants' directed their activities in the State of New Jersey and availed themselves of laws of the State of New Jersey.

*FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS*

*PLAINTIFF EPITOMIZES THE QUALITIES OF A LEGAL PROFESSIONAL*

97.     Plaintiff joined 54gene as its General Counsel in September 2021 pursuant to a written agreement, reporting to then Chief Executive Officer, Abasi Ene-Obong, 54gene's founder, with the title of General Counsel, and an annual compensation of $330,000.

98.     Prior to Plaintiff's forced resignation only sixteen months later, Plaintiff conducted herself as the consummate legal professional, embodying integrity, expertise, and a tireless dedication to excellence.

99.     Plaintiff's legal acumen qualifications are extensive, as a respected member of the New York State Bar, the New Jersey State Bar, and the State of Connecticut Bar since 1999,

2002, and 1996 respectively.

100.    Plaintiff possesses a unique blend of legal, compliance, management, and cybersecurity expertise.

101.    Less than nine months later, Plaintiff was informed in July of 2022 that 54gene was running out of money, and could be insolvent by September 2022, due to, at best, questionable spending by now former executives.

*DEFENDANT CHIARELLO ONBOARDS AS A CONSULTANT TO*
*COACH THE FORMER CHIEF EXECUTIVE OFFICER*

102.    During 54gene's fiscal crisis in the summer of 2022, the Chair of the Supervisory Committee, Defendant Yip, brought in a personal friend, Defendant Chiarello, to act and be paid as a consultant to coach the then Chief Executive Officer and to aid him in his attempt to retain the reigns of 54gene amidst the financial debacle.

103.    During an emergency meeting of the Board of Directors in July 2022, upon information and belief, there were discussions concerning the interplay of financial strain, inexplicable fund discrepancies, and 54gene's desperate pursuit of alternative financing that all gave rise to a nuanced financial quandary for 54gene.

104.    Upon information and belief, eventually, the investors were made privy to the dire financial circumstances, and Plaintiff was forced, along with other employees, to forgo any wage compensation from August 2022 onwards.

105.    Despite not receiving any rightful wages, Plaintiff continued to diligently discharge her duties, without receipt of lawful remuneration.

106.    This unlawful withholding of compensation persisted until the end of October 2022.

107.    In the meantime, upon information and belief, the Board of Directors engaged the

services of an external auditor to investigate and attempt to identify the spending that precipitated 54gene's financial instability.

108.    Upon information and belief, ultimately, the findings of the audit, combined with the restrictive conditions of the financing procured by 54gene, necessitated the departure of the former Chief Executive Officer and former Chief Operations Officer from the management team, and the Chief Executive Officer resigned, effective immediately, in mid-October 2022.

109.    Upon information and belief, the Supervisory Committee, which includes Defendants Yip, Oke, Milos and Oussaifi was put in place as a requirement to the Bridge Loan round of funding and it now acts in the stead of the Board of Directors, to safeguard and protect investors against predatory expenditures and it makes all executive decisions of 54gene.

110.    Plaintiff alleges upon information and belief, that each of the Supervisory Committee members named as Defendants here were selected based upon their companies significant investments in 54gene, and it is not presently known, what, if any, compensation 54gene is paying each Supervisory Committee member.

111.    As part of the protections sought for 54gene, it was at this critical legal crossroad that the Board of Directors/Supervisory Committee convened an emergency meeting in October 2022, upon the former Chief Executive Officer's departure and beseeched and pleaded with Plaintiff to assume the position of Interim Chief Executive Officer to, upon information and belief, assuage investor apprehension.

112.    Acknowledging Plaintiff's unwavering integrity and lack of involvement in the prior financial mismanagement, the Supervisory Committee unanimously consented on October 21, 2022, to appoint Plaintiff as Interim Chief Executive Officer while retaining her General Counsel title and responsibilities, with a grant of a seat on its Board of Directors as the acting

Interim Chief Executive Officer.

113.    As the ink was still wet on Plaintiff's elevation, the Defendants informed Plaintiff that 54gene was unable to sustain her contractual based salary and ultimately unlawfully slashed her compensation by 46.7%, down to $175,999 to be effective November 1, 2022.  This reduction was unlawful and violative of the terms of Plaintiff's written agreement and constituted a fulsome breach of contract.

114.    Plaintiff's reduction in remuneration was significantly disparate and more devasting than Plaintiff's white and Asian male colleagues, including those that reported to her, including Colm O'Dushlaine, Vice President, Genomics and Data Science, who was paid $200,000 annually, Ji He, Senior Vice President, Technology, who was paid $225,000 annually.

115.    Plaintiff held a senior position to both O'Dushlaine and He.

116.    Plaintiff had more responsibilities in her dual role as Interim Chief Executive Officer and General Counsel than either of O'Dushlaine and He and such constitutes unlawful disparate treatment, as Plaintiff was paid less because of her race and/or gender.

117.    Additionally, as the predominately white Supervisory Committee was then in place, Plaintiff, as a Black skinned woman, was paid less than her white colleagues, who were less qualified, less educated and had less responsibilities than Plaintiff.

118.    Despite the steep reduction of Plaintiff's compensation, upon information and belief, 54gene inexplicably continued to pay Defendant Chiarello, a mere consultant, monthly wages, upon information and belief, that then far exceeded Plaintiff's unlawfully slashed compensation, in the range of $5,000 to $25,000, and later paid him $24,500 monthly, annualized to be $294,000.

119.    By the end of October 2022, 54gene had only managed to repay Plaintiff one out

of three months' salary that it wrongfully withheld and that was due and owing for August, September and October 2022.

120.    54gene's financial efforts have been plagued with missteps and miscalculations, and their Chief Operations Officer's resignation on November 8th, 2022, was just the then latest in a series of setbacks.

121.    Upon information and belief, 54gene's financial instability persisted throughout November, as it had failed to secure the full amount of the Bridge Loan funding it sought, causing it to miss its payroll for November 15, 2022 in the United States.

122.    In a selfless act of leadership, Plaintiff offered to forgo her own salary cycle to ease the financial burden on her team, despite the past, upon information and belief, financial mismanagement of her predecessors still haunting 54gene.

123.    During these tumultuous times, Plaintiff was instrumental in ensuring that 54gene's legal and compliance functions operated efficiently and effectively, with particular attention to compliance and ensuring that there was not a repeat of the funding fiasco that was alleged to have occurred under the stewardship of the former Chief Executive Officer and then Board of Directors.

124.    Plaintiff developed and implemented various legal and compliance strategies that aligned 54gene's African centric objectives and operations.

125.    During her tenure as Interim Chief Executive Officer, Plaintiff's unwavering determination and keen strategic vision allowed her to spearhead a global reduction in force of over 100 employees, developing a plan to sell 54gene's assets "out of nothing" to increase cashflow, engaged with investors in support of increasing participation in the efforts to obtain the financial support to keep the company afloat.

126.    As Interim Chief Executive Officer, Plaintiff expertly managed vendors, reduced the risk of lawsuits, settled outstanding accounts receivable, and was instrumental in garnering commitments from 54gene's clients with the largest outstanding accounts receivables.

127.    Plaintiff accomplished these objectives while she continued to serve in the dual role of General Counsel and Interim Chief Executive Officer, without a Chief Operating Officer, a mere part time Chief Business Officer (Defendant Chiarello), no Business Development Team, a single Human Resource employee, and with no communications, marketing, or administrative support.

128.    Plaintiff's exceptional leadership skills and ability to execute under these demonstrative challenging circumstances are truly extraordinary.

*54GENE'S EQUAL PAY VIOLATIONS AND FINANCIAL SHUFFLING*

129.    As the end of 2022 drew to a close, upon information and belief, 54gene struggled to scrape together enough money to repay Plaintiff another month of back salary, still owing her a third month, and only finally paid the outstanding third month after Plaintiff was forced to resign.

130.    Yet, 54gene was able to continue paying its "consultant," Chiarello, $20,000 per month for the months of August, September, and October 2022, while Plaintiff, who was then acting as both General Counsel and Interim Chief Executive Officer, was not being paid at all.

131.    Plaintiff's talents were undercompensated considering her deep experience in managing cross continent employees that specifically aided 54gene's effort to mitigate legal risks and improved 54gene's ever constant whirling compliance posture.

132.    Despite Plaintiff's knowledge, experience and multistate bar admissions, her overall compensation was disparate and less than her white skinned counterparts on the

management team and she was paid even less when she later ascended to the Interim Chief Executive Officer role at the bequest and pleading of the Supervisory Committee, who then mutilated her compensation.

133.    Further, as detailed herein, despite a later consultancy agreement, Plaintiff was engaged as a consultant in March 2023, but was never paid for her consulting work, whilst her male colleagues, who were then too consultants, were fully compensated, including Chiarello.

134.    In the fall of 2022, Chiarello continued to be paid in his role as a consultant yet was floundering as his original reason for retention (to be a "coach") had evaporated when the former Chief Executive Officer resigned in October 2022.

135.    Chiarello was given the empty title of Chief Business Officer, a title without distinction nor responsibility, yet his compensation remained inexplicably higher than Plaintiff.

136.    54gene paid Plaintiff less than her white colleagues, or just failed to pay her at all, both of which are unlawful.

137.    Likewise, having performed all of the duties under the written compensation agreement that was agreed to at the commencement of her employment, 54gene's unilateral reduction constitutes a breach of contract.

138.    Chiarello, clinging to his consulting agreement, and without any clear role in the African-Nigerian focused company, upon information and belief, devised a plan to insert himself into the executive management team as he sought to ascend to the position of Chief Executive Officer.

139.    The first step in Chiarello's scheme was to feign assistance to Plaintiff in her role as Interim Chief Executive Officer.

140.    Chiarello using his chameleon like white influence, pretended to be supportive of

Plaintiff, sending her text messages of false encouragement after Oke had eviscerated her in meetings, offering to lessen the harassing burden inflicted upon Plaintiff by way of being a shoulder to lean on, all of which was faked.

141. Instead, Chiarello was just another camouflaged wolf in sheep's clothing seeking to sabotage Plaintiff and push her to the outer limits of her tolerance of unlawful discriminatory, harassing, disparate and polluted work environment, all of which he personally and intentionally contributed to.

142. The later revelation that Chiarello's true intention, with the support of Yip, was to take over as solo Chief Executive Officer of 54gene rather than to provide any meaningful assistance in a Co-Chief Executive Officer role to Plaintiff is disgraceful.

143. It is deeply disturbing that 54gene, aided by the Individual Defendants, with a supposed mission focused on the African continent and its people, allowed individuals from the rebooted white Ivory Tower in the United States to effectively oust the only Black skinned woman of African descent, and its Co-Chief Executive Officer, and General Counsel, and replace her with an unequivocally less qualified white male, and shielding their unlawful conduct from the 54gene investors.

144. Chiarello never had any intention of being a "Co-CEO," his intention was merely to force Plaintiff aside and take the role for himself.

145. Chiarello's actions in intentionally sabotaging and interfering with Plaintiff's professional standing, is a reprehensible act he executed by disseminating false and misleading information and derogatory accounts of Plaintiff's performance to the Board of Directors, Management Team, and Supervisory Committee.

146. In the process, Chiarello completely disregarded his fiduciary duties that he owed

to 54gene by wholly ignoring the known discrimination, harassment, and emotional turmoil that Plaintiff was subjected to by Oke.

147.    Instead, Chiarello chose to treat Plaintiff as a mere obstacle in his path to the zenith of his career, and therefore, thought nothing of using Plaintiff as a ladder rung to climb the corporate hierarchy and attain the coveted position of solo Chief Executive Officer, as nothing less would satisfy his ego.

148.    Apparently Chiarello having previously served as a chief executive officer of white focused companies, was not content with being a mere consultant or a Co-CEO, he wanted to be the sole Skipper of the African ship.

149.    Upon information and belief, Chiarello has never stepped foot on the continent of Africa since he joined 54gene, and his newfound concern for the global plight of African's who suffer disproportionately from disease is merely contrived for public consumption.

150.    As the result of the discriminatory, harassing, and disparate treatment by Defendants, along with their empty and false support, Plaintiff's work environment was literally unbearable on a day to day basis.

151.    It was the recognition of her unlawful treatment, coupled with the knowledge that Chiarello's was, upon information and belief, in the shadows salivating in anticipation of her breaking point, that Plaintiff was forced to resign her position on January 16, 2023.

152.    Plaintiff's resignation on January 16, 2023, was a courageous stand against Defendants' adverse and unlawful conduct.

153.    Defendants knowingly permitted pervasive conditions of discriminatory, harassing, disparate and rank work environment that severely impacted Plaintiff's mental, physical, and professional well-being.

154.     These conditions were intolerable, and no reasonable person subjected to similar unlawful conduct would have allowed them to continue.

155.     Plaintiff's decision to use her voice and speak out against these injustices serves as a powerful reminder that harassment and discrimination of any kind is unlawful and will not be tolerated in workplaces in New Jersey.

156.     As soon as Plaintiff's resignation was formally in the queue, Chiarello and Yip seized the moment and on January 25, 2023 changed Plaintiff's title to Co-CEO with Chiarello being her Co-CEO, and the next day announced in 54gene's first ever shareholder meeting the Co-CEO roles, never disclosing to its shareholders that Plaintiff was in fact forced to resign as the result of Defendants' purposeful discriminatory, harassing, disparate and hostile work environment.

157.     Apparently desperate to keep using Plaintiff's talents and legal qualifications, 54gene requested that she stay on as a consultant in a part-time capacity following her forced resignation.

158.     A consulting agreement was drafted as between Plaintiff and 54gene, providing for payment of monthly compensation of $10,000 for Plaintiff's continued work, but 54gene failed and refused to execute the consulting agreement, despite several requests by Plaintiff to Chiarello, but it accepted all of Plaintiff's work and contributions under the guise of the consulting agreement, and never paid her.

159.     Despite 54gene and Chiarello's promises of a formalized consulting agreement, Plaintiff's reasonable reliance upon those promises, Plaintiff has to date not been paid for the provision of her services thereunder.

160.     In yet another example of disparate conduct, while 54gene withheld a signed

agreement and refused to pay Plaintiff, it formalized and signed agreements with her white male colleagues who continued to receive their consulting renumeration, including Chiarello.

161.    In a further effort to humiliate Plaintiff, and without consulting Plaintiff, 54gene made a hasty March 14, 2023 public announcement, changing Plaintiff's title from Co-Chief Executive Officer and General Counsel to Senior Advisor.

162.    54gene did this, upon information and belief, at Chiarello's insistence, because he immediately wanted it known that he was the solo Chief Executive Officer, having tolerated being a Co-CEO for all of forty-eight days.

163.    Upon information and belief, no other male employee or white employee has ever been publicly demoted like Plaintiff.

164.    As a matter of fact, male employees, both white and Asian, who moved to consultant roles were provided even more elevated titles than the ones they held as employees.

165.    For example, Colm O'Dushlaine previously held the title of Vice President of Genomics and Data Science, yet upon his resignation and engagement as a consultant his title was elevated to Chief Genomics Officer.

166.    Dishan De Silva, who previously held the title of SVP of Finance, and now as a consultant has been elevated to Chief Financial Officer, both as indicated on the company's website.

167.    Plaintiff later learned that 54gene intended to elevate Karibo to the role of General Counsel and Chief of Staff.

168.    Plaintiff provided 54gene with privileged advice concerning Karibo, which was wholly ignored.

169.    Plaintiff alleges, upon information and belief, that the purpose of Karibo's

elevation was to provide 54gene investors the false sense that 54gene had United States licensed lawyer as its new General Counsel , which was no longer true after Plaintiff's forced departure.

170.    54gene, and in particular Chiarello, proceeded to publicly hold Karibo out to investors as General Counsel and Chief of Staff to 54gene in a companywide email and to investors via 54gene's website.

171.    Upon information and belief, Karibo is a licensed lawyer in the Republic of Nigeria but is not licensed to practice law in the United States.

*DEFENDANTS USED PLAINTIFF'S BLACK SKIN TONE TO PROMOTE ITS AFRICAN PRESENCE*

172.    The Board of Directors, and later the Supervisory Committee, used Plaintiff's African toned skin-color as the "on the ground" facing C-Suite executive as she was repeatedly directed to travel to Nigeria and other African countries as 54gene's Black ambassador, a role Chiarello could not fill.

173.    By way of example only, 54gene commoditized Plaintiff's race in sending her to be the Black facing United States legal and C-Suite representative of 54gene as follows: Plaintiff was sent to Nigeria in October 2021 for a Business Development/Sales Team meeting, then onto to Kenya for meetings with potential partners for the diagnostics business 54gene was then launching; Plaintiff was then tasked with another trip to Nigeria the following month in November 2021 for the purpose of collaborating with the cybersecurity and compliance team that reported to Plaintiff as well as to manage the then commencing Nigerian audit by KPMG; Plaintiff was instructed to travel back to Kenya in January 2022 to meet with new potential partners and companies 54gene was considering acquiring for its diagnostics business as well as a local Kenyan law firm for local legal guidance; Plaintiff was directed to travel next to Lagos in May of 2022 in route to Senegal to implement the signing of a Memorandum of Understanding

("MOU") with an academic institution there to begin a research study; Plaintiff was again tasked with another trip in June 2022 to Nigeria and onto Tanzania to sign another MOU with its Minister of Health and then to Botswana with additional meetings with its Minister of Health as well as the Special Economic Zone commission to discuss setting up operations in Botswana; and Plaintiff's final trip to Nigeria was in December 2022, at the insistence of the Supervisory Committee, with a purpose of meeting with Nigerian investors as well as uplift the morale of employees remaining in Nigeria.

174.    Chiarello did not got to Africa in December 2022.

175.    Yip did not go to Africa in December 2022.

176.    Milos did not go to Africa in December 2022.

177.    Instead, each were content to stay in their lofty Ivory enclaves in California and Rhode Island, respectively, while Plaintiff, the only Black skinned female had to journey around the globe to promote 54gene's Black-African focused business agenda.

178.    54gene did not send Oke or Oussaifi, members of its Supervisory Committee, who were already on the African continent, in Nigeria and Tunisia, respectively.

179.    Yet, predictably, when Plaintiff raised her claims of discrimination, harassment, disparate treatment and hostile work environment in a formal letter to the Defendants, they conveniently each sought to weaponize Plaintiff's grueling global travel as if they were some form of unauthorized trapes to a relaxing tranquil sea retreat for a personal spa journey.

180.    Indeed, the current Supervisory Committee of 54gene took every economic advantage derived from Plaintiff's African continent travel and global engagement of Black leaders, with the intention of monetizing the MOUs that were signed during Plaintiff's travel.

181.    Defendants after the fact slurs contained in their May 5  Defamatory Letter were

contrived, immoral and constitute false accusations.

182.    Plaintiff's 54gene African travel was in compliance with company travel and expense policies, preapproved, expensed, and those expenses approved pursuant to 54gene's policies.

183.    Defendants' freshly crafted and contrived new narrative raised only after Plaintiff sent her formal letter detailing Defendants' discriminatory and unlawful conduct rings hollow.

184.    Equally bizarre, and reminiscent of the 13th chime on a clock, are Defendants' concocted accusatory falsehood that Plaintiff's African travel was unauthorized and some illusory violation of 54gene's travel policy.

185.    Neither is true, and Defendants' attempt to camouflage their miserable conduct by deceptive deflection is fabricated out of whole cloth.

186.    Defendants' retaliatory and false accusations constitutes defamation, as they are all false statements about Plaintiff; Karibo communicated the statements about Plaintiff to third parties; Karibo's statements about the Plaintiff amount to nothing less than purposeful negligence under the guise of a threat against her reputation; and Plaintiff has suffered damages as a result.

187.    Defendants, through their agent, Karibo, retaliated against Plaintiff in their May 5 Defamatory Letter all in an attempt to threaten and intimidate Plaintiff.

188.    By offering the false accusations, and signaling their willingness to lie, Defendants' sought to squelch and coerce Plaintiff from bringing her claims to light.

189.    Plaintiff avers that the light should shine bright on those, including Ron Chiarello, Tobi Oke, Jenny Yip, Patrice Milos, Yassine Oussaifi and 54gene, Inc. who threaten her livelihood and profession as an esteemed member of the Bar of the State of New Jersey with

their empty smears.

190.   Oke, Yip, Milos and Oussaifi's use of their own investor external email addresses (tobi@v8cappartners.com, jy@adjuvantcapital.com, patricemilos06@gmail.com and yassine.oussaifi@africinvest.com) in their collective threats against Plaintiff, as if telegraphing that these huge and wealthy investors were collaborative in the aggression against Plaintiff, only serves to highlight their pathetic attempt to wield their affluency and power to intimidate the lawful claims of a single African woman seeking redress.

*CHIARELLO'S UNLAWFUL CONDUCT AND OKE'S DISCRIMINATORY AND HARASSING CONDUCT WERE EMBRACED AND CONDONED BY 54GENE*

191.   Further demonstrative of Plaintiff's claims here against Chiarello include his morally corrupt conduct, his turning a blind eye to the harassment of Plaintiff, his indifference to her suffering, his active attempt to conceal his unlawful participation and tolerance of the disparate treatment of Plaintiff through attempts to intimidate and undermine Plaintiff using false narratives, his false accusations against Plaintiff of uncooperativeness, his false accusation that Plaintiff went "rogue" in conducting a company-wide town meeting, are all unlawful.

192.   It is particularly egregious that Chiarello planned a global town hall with Plaintiff, discussed the messaging of the meeting, was notified of its scheduled time, which was the day and time recommended by himself, with an invite, failed to show up, and later accused Plaintiff of somehow going off script by conducting the townhall without him.

193.   In fact, Plaintiff waited for Chiarello to join the global town hall, and when he did not bother to join the meeting, and with a fully engaged Zoom call under way, Plaintiff used her on the spot leadership skills to guide the global meeting.

194.   Chiarello's later claim that he knew nothing about the town hall meeting lacks veracity and is demonstrably false based upon the exchanged text messages between Plaintiff and

Chiarello.

195.    Chiarello's attempt to undermine Plaintiff in retaliation for her complaints to the Chair of the Supervisory Committee, and to him directly, were unlawful.

196.    Indeed, it was only after Plaintiff was forced to resign her position that Chiarello sent a March 1, 2023 email to the Supervisory Committee to specifically advise that "[a]s a reminder the SC [Supervisory Committee] does not have decision making authority on personnel. While inputs are valued all staffing decisions rest with me and the team. Furthermore, it is part of my job to create a safe and thereby productive work environment for everyone. . . ."

197.    Chiarello's newly minted and feigned team spirit was too little and too late.

198.    The documentary evidence confirms that Oke's abhorrent conduct, acknowledged in Chiarello's March 1, 2023 email, towards Plaintiff was not only discriminatory but was also aggressive harassment.

199.    The events surrounding Oke's unchecked actions towards Plaintiff highlight the pervasive toxicity that permeates the work environment within 54gene and its whitewashed US ranks.

200.    It is evident that by 54gene inviting Oke to join the Supervisory Committee, after being informed of his unlawful conduct, granted him an embolden sense of power and superiority over Plaintiff, and further allowed him to engage, with 54gene's blessing, in discriminatory and harassing behavior towards Plaintiff.

201.    The Individual Defendants have each aided and abetted and share in the responsibility for perpetuating the discrimination and harassment that Plaintiff endured.

202.    Oke personally subjected Plaintiff to unlawful discriminatory and harassing conduct, should in fact be held accountable for his unlawful actions.

203.   Oke's discriminatory conduct directed at Plaintiff included, falsely accusing Plaintiff of making mistakes, falsely accusing Plaintiff of being legally incompetent, harassing her because she was a Black female, belittling her, humiliating her, unfairly criticizing her work product, and Oke did none of these unlawful and awful things to the white women on the Board of Directors, or the Supervisory Committee, Oke selectively discriminated against Plaintiff because of her combined protected status of being a Black skinned woman.

204.   Oke's harassment was unlawful as Plaintiff was forced to endure the offensive conduct as a condition of her continued employment, and Oke's pervasive attacks on Plaintiff's character, including screaming tantrums, created a work environment that any reasonable person in Plaintiff's position would consider intimidating, hostile, and abusive.

205.   The additional fact that the Board of Directors and Supervisory Committee knew of, witnessed, and then ignored Oke's outrageous unlawful behavior and failed to investigate it, or intervene to stop it, or punish him, is a serious breach of their duty to protect Plaintiff, their employee, and the duty they each owe to 54gene.

206.   As noted *infra,* the Defendants did not punish Oke for his unlawful conduct, they gave him a chair to the executive table.

207.   Oke directed his venomous behavior and physically intimidating threatening outbursts at Plaintiff because of her multilayered protected status.

208.   Defendants failed to provide Plaintiff with a safe work environment free from discrimination and harassment.

209.   Plaintiff was cognizant of her unlawful mistreatment and actively expressed her concerns directly to members of the Board of Directors, and the Supervisory Committee Chair, Yip and Chiarello, and later Milos, and each of them failed to do anything, offering only the

token empathy that it was an understatement to describe Oke as a "tough nut to crack."

*YIP AND MILOS FAIL AND REFUSE TO SHIELD PLAINTIFF FROM KNOWN UNLAWFUL HARASSMENT*

210.    It is indeed pathetic for Plaintiff to have to observe and endure the notion that women refuse to assist their fellow women is still alive and thriving at 54gene.

211.    Plaintiff sought out Yip and described the humiliating harassing conduct inflicted by Oke, some of which Yip had herself witnessed.

212.    Yip did absolutely zero to shield Plaintiff from the harassing and disparate treatment.

213.    Milos apologized for putting Plaintiff in the position where she was vulnerable to Oke's harassment but did nothing to stop it either.

214.    Once Oke learned of Plaintiff's complaints against him (upon information and belief, from Yip, Milos or Chiarello, or a combination of each of them), he doubled down and leaned into his pervasive hostility toward Plaintiff, and the resulting alteration of Plaintiff's conditions of employment became unbearable and abusive.

215.    Oke made sure Plaintiff's work environment was oppressive and hostile and his non-sexual offensive harassment of Plaintiff based upon her Black female characteristics and qualities violates the conditions of Plaintiff's employment.

216.    Despite her complaints, Plaintiff was still forced to attend meetings and interact with Oke who continued to intimidate her and act in a superior position over Plaintiff.

217.    Plaintiff's interactions with her own colleagues were thereafter negatively shadowed by their knowledge of Oke's discriminatory and demeaning slurs, along with the realization that there were no consequences for such unlawful behavior.

218.    As a direct and proximate result, Plaintiff was forced to quietly retreat in silence

with the unfortunate awareness that the Defendants had no intention of adherence to the public-facing mission to lift up the African people or required anti-discrimination policies, but instead, protected the unlawful conduct of only those Directors and Members who were intimately connected to the 54gene revenue stream, Oke's firm being a primary investor in 54gene.

219.    As the result of Oke's meanspirited, dominating and unlawful conduct directed solely toward Plaintiff, she has suffered severe harmful psychological, mental and physical injuries.

220.    It was the totality of the unlawful conduct, coupled with the knowledge that the Defendants were collectively intent on protecting Oke over her, that compelled Plaintiff to resign from her position.

221.    Defendants' collective conduct constituted an unlawful employment practice in that Oke's pervasive and severe conduct violated Plaintiff's conditions of employment and Defendants' failure to correct the hostile working conditions resulted in Plaintiff's forced resignation and constructive discharge and constituted a tortious interference with Plaintiff's prospective economic advantage.

222.    The burden of Defendants' discrimination weighed heavily upon Plaintiff, an accomplished attorney of almost thirty years.

223.    Plaintiff's decision to pursue the instant claims comes at a heavy price.

224.    Defendants have already sent Plaintiff the May 5 Defamatory Letter, looking to contaminate her resolve in pursuit of her claims against them.

225.    Defendants' May 5, Defamatory Letter sought to intimidate, coerce and further harass Plaintiff to shield their unlawful behavior.

226.    Defendants' conduct in this regard is hateful and retaliatory.

227.    Defendants' attempt to tarnish Plaintiff's stellar reputation as a member in good standing of the State Bars of New York, New Jersey and Connecticut through defamatory threats is both petty and unlawful.

228.    Oblique threats of blackballing an accomplished lawyer with the use of false and defamatory statements, coupled with 54gene's agent's query of how Plaintiff will ever be employable if she files suit are both scandalous and impermissible under governing law.

229.    Confirming their unlawful disparate treatment of Plaintiff, Defendants have never treated a departing male employee with such vile threats and has done so here solely because Plaintiff is a Black skinned female who dared to raise her voice.

230.    Defendants' intimidation and hostility toward the only Black female in the US C-Suite, Plaintiff, is repugnant.

231.    Defendants wrongfully imposed a sense of degradation, discouragement, and deprived Plaintiff of self-respecting employment.

232.    Oke continually and repeatedly berated Plaintiff, he humiliated, marginalized, and diminished her, accused her of incompetence in front of her colleagues and vendors, defaming her, rendering her powerless, voiceless, and subjecting her to a known and tolerated toxic work environment, all while the remaining Defendants looked on as mere mannequins to his anger laced tirades.

*54GENE USED PLAINTIFF AS ITS MINORITY MARIONETTE*

233.    54gene exploited Plaintiff's Black skin color and used Plaintiff as its minority marionette in her role first as General Counsel, then as Interim Chief Executive Officer, and later Co-Chief Executive Officer (without disclosing her previous resignation to shareholders).

234.    By way of example only, Defendants had no problem parading Plaintiff out to

lead the first and only 54gene investor facing meeting in January 2023.

235.    Defendants used Plaintiffs Black skin tone and African Ancestry in offering the 54gene investors the illusion that 54gene's leadership was still led by a Black skinned-tone person.

236.    While Plaintiff lead the investor presentation and volleyed investor questions, Chiarello and Yip piped up every now and again just to be sure someone could pick them out of a zoom snap shot as actually having attended the investor meeting.

237.    It is shameful that Defendants thought nothing of using Plaintiff's protected characteristics, that included her race and African ancestry when it wanted a Black face to communicate to its African investors, and then abused and harassed her for those very characteristics.

238.    The United States Supervisory Committee members, Chiarello, Yip and Milos, have zero experience on the African continent, they would prefer to reign from the Ivory Tower.

239.    Defendants' subterfuge in racial and gender purification of the sole woman of color is violative of the laws of the State of New Jersey.

240.    Equally clear is Defendants' failed attempt at diversity to salvage their public mission by their now United States based white rebooted leadership.

241.    None of the Supervisory Committee members in the United States are Black or of African descent (Chiarello, Yip and Milos).

242.    Plaintiff avers that Chiarello, Yip and Milos' inner white circle connections to the Ivory revenue stream was evidently more influential than actual compliance with the law, irrespective of the overall African, and specific Nigerian focus, of 54gene.

243.    Plaintiff's diversity confirms that she is in multilayered categories of protected

status under the law, including color and gender.

244. These characteristics were unlawfully weaponized against her by each Defendant.

245. 54gene's exclusively forged inner sanctum connections to the Ivory Tower, with Yip as the Chair of the Supervisory Committee and Chiarello as the new solo Chief Executive Officer, were evidently more influential than actual compliance with the law against discrimination and hostile workplace.

246. It is no longer the case that smart professional and educated women must remain silent in the face of discrimination, for fear that their reputations will suffer.

247. Plaintiff avers that it is time for the employers who employ predatory persons (both men who harass, and women who stand by and do nothing) to abide by governing law.

248. Indeed, 54gene here engaged a talented professional in New Jersey to run its business. 54gene and the Individual Defendants are all subject to, and must abide by, the laws of the State of New Jersey and answer for their collective unlawful behavior.

249. The State of New Jersey is a zero tolerance jurisdiction, and it protects against the harassing and discriminatory conduct alleged herein.

250. Defendants treated Plaintiff as an employee in a number of protected categories wholly different than they treated their white employees.

251. Defendants disparate treatment of Plaintiff confirms their culture of inequality and exclusion within its white executive workplace.

252. Defendants discriminated against Plaintiff by their intentional and purposeful mistreatment of Plaintiff based on her diverse and protected status, including discriminatory failure to abide by 54gene policies and practices as applied to white employees verses Black skinned and diverse employees like Plaintiff.

253.     Plaintiff was paid less than her white colleagues because of her protected diverse qualities and characteristics.

254.     Defendants were specifically aware that Plaintiff is a Black skinned woman from her outward appearance and their individual interactions with Plaintiff.

*COUNT ONE*

*VIOLATION OF NEW JERSEY LAW AGAINST DISCRIMINATION AGAINST 54GENE*

255.     Plaintiff realleges the foregoing paragraphs numbered 1 through 254 as if fully restated and alleged in support of this Count One.

256.     This Count One is instituted on behalf of Plaintiff, Teresia Bost, pursuant to the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq. (hereinafter, "LAD") and as a result of 54gene's direct and repeated violations of the protections afforded therein, and specifically for its discrimination, harassment, hostile work environment and disparate treatment of Plaintiff and its later retaliation against Plaintiff.

257.     54gene violated LAD in allowing, failing to investigate and condoning the discriminatory conduct alleged herein.

258.     54gene violated LAD by engaging in, allowing, failing to investigate and condoning the harassing conduct alleged herein.

259.     54gene violated LAD by engaging in, allowing, failing to investigate and condoning the disparate treatment conduct alleged herein.

260.     54gene violated LAD by engaging in, allowing, failing to investigate and condoning the toxic work environment conduct alleged herein.

261.     54gene violated LAD by engaging in, allowing, failing to investigate and condoning the retaliatory conduct alleged herein.

262.    Plaintiff was at all times relevant hereto, employed by 54gene.

263.    Plaintiff was hired by 54gene in September 2021, holding various positions, including General Counsel, Interim-Chief Executive Officer, Co-Chief Executive Officer, and lastly after her forced resignation, demoted to "Senior Advisor" in a public facing announcement.

264.    A relationship of employer and employee did in fact exist between 54gene and Plaintiff at all relevant times.

265.    At all times relevant hereto, Plaintiff's diversity of race and gender were all known to 54gene, and upon which provides Plaintiff with protected status under LAD.

266.    At all times relevant hereto, 54gene was engaged in employment activities in the State of New Jersey and is an employer as that term is defined under LAD.

267.    At all times relevant hereto, each of either members of the Board of Directors, or of the Supervisory Committee, or both, were agents and/or servants and each used their affiliation and position of authority at 54gene against Plaintiff and to her detriment and injury.

268.    At all times relevant hereto, the Individual Defendants, Chiarello, Oke, Yip, Milos and Oussaifi, served in a supervisory capacity and had supervisory and managerial authority over Plaintiff including the power to, *inter alia*, hire, fire, demote and/or otherwise punish Plaintiff.

269.    During the course of Plaintiff's employment, she was subjected to severe, egregious, pervasive, harassing and offensive behavior by Oke and treated differently in her employment as a direct result of her protected and diverse status.

270.    Plaintiff was targeted in the following non-exhaustive examples of 54gene's unlawful discriminatory conduct: (i) punishing Plaintiff for complaining about Oke's harassing and discriminatory conduct of racial and gender (detailed *supra*); purposely required Plaintiff to attend meetings with Oke knowing she would be subject to continued discriminatory harassment,

(ii) 54gene never bothered to investigate Plaintiff's complaints of racial and gender discrimination by Oke, he was never admonished, and instead, 54gene gave him a seat on the Supervisory Committee; (iii) Plaintiff was used as a minority puppet in 54gene's outward facing African mission, whilst she suffered to the point of harmful impact upon her physical and mental wellbeing; (iv) Plaintiff, the only Black skinned member of 54gene's C-Suite of African descent was used by the Defendants as a "Black" proxy, putting Plaintiff on center stage at the inaugural investor meeting, attended by a majority of African investors, while her white colleagues receded into the shadows confirming their genetic naivety; (v) Plaintiff was treated differently than her white counter parts in her pay and in her exit from 54gene; (vi) 54gene refused to equally compensate Plaintiff, and paid her less than her male colleagues or failed and refused to pay her at all; (vii) 54gene specifically retaliated against Plaintiff, using its investors clout as a weapon against her, after she voiced her complaints of harassment and discrimination in the May 5 Defamatory Letter and its agents unveiled threat that if Plaintiff filed suit her forward looking employment prospects would be negatively impacted; and (viii) Plaintiff was the only non-white employee, who had fulsome knowledge of all of 54gene's unlawful conduct noted above, she was literally the last United States based Black person to be cleansed from 54gene's management ranks.

271.    Plaintiff's complaints of multilayered discrimination were ignored.

272.    Oke and Chiarello's inner circle of connections to the male investors revenue stream was evidently and entirely more influential than actual compliance with the law.

273.    As a direct and proximate result of all of the foregoing, Plaintiff was forced to quietly retreat with the unfortunate awareness that 54gene had no intention of adherence to its public-facing mission to support people of color, but instead, protected the unlawful conduct of

only those male Board Members and Supervisory Committee Members who were intimately connected to the financing flowing in and out of 54gene.

274.   The unlawful hostile work environment would not have occurred but for the Plaintiff's protected status.

275.   The harassment by Oke described herein was in fact severe and pervasive such that Plaintiff, and any reasonable person, believed that the conditions of her employment had been altered and that the working environment was toxic, hostile and abusive.

276.   The severity of Oke's harassment, unlawful discrimination and creation of a rancid work environment was exacerbated by the fact that Oke was in dominant and superior position over Plaintiff, which only served to magnify the gravity of, and immeasurably increased the severity of, his unlawful conduct directed at Plaintiff.

277.   In sum, absent the unlawful racial and gender discrimination, harassment, disparate treatment, and unacceptable work environment that was wholly condoned by 54gene, and its elitist Board of Directors and Supervisory Committee Members, Plaintiff would not have been forced to resign and be utterly humiliated.

278.   Plaintiff now finds herself unjustly unemployed at age 52 with a negative story to tell all potential future employers regarding her time at the now white enclave of 54gene.

279.   A negative account that 54gene ensured would stick after Chiarello sent his self-serving and reputationally damaging emails about Plaintiff upon her departure and the later publication of the retaliatory May 5 Defamatory Letter.

280.   54gene's discriminatory and retaliatory agenda to maintain its monochromatic United States based management C-Suite and now non-diverse leadership is a perversion of 54gene's stated mission to its Black constituency and investors alike.

281.    54gene cannot cloak Plaintiff's forced and humiliating separation as self-imposed, it was the purposeful unlawful harassment and discrimination against the only United States leadership position held by a Black woman that led Plaintiff to protect herself in the only way she knew how, resign.

282.    54gene's unwavering determination to transform 54gene from its stated mission to support the development of medical data to aid the continent of Africa and African descendants, into a United States based White Ivory Tower of leadership, with Chiarello as the Skipper of the boat, is truly Machiavellian and unlawful.

283.    54gene cannot use hollow excuses as a flak jacket to conceal and camouflage its unlawful treatment of Plaintiff described herein.

284.    Accordingly, Plaintiff's claims here arise as a result of unlawful violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq. for its purposeful tolerance (and thus its promotion) of unlawful harassment, racial and gender discrimination, and embracement of a hostile work environment.

285.    The extensive damages Plaintiff has sustained are significant.

286.    The allegations set forth above are not intended to be an exhaustive list of all of the allegations against 54gene, but merely a representative sample.

287.    At all times relevant hereto, 54gene committed all of the aforesaid acts and/or omissions with negligent, and/or reckless, and/or willful, and/or wanton, and/or malicious, and/or intentional disregard of how such acts and/or omissions would affect a reasonable person of Plaintiff's color, race, age and/or a reasonable person in a similar position of employment as Plaintiff.

288.    As a result of any or all of the aforesaid acts and/or omissions, Plaintiff

reasonably believed that the condition of her employment had been severely altered and that the aforesaid acts and/or omissions occurred for reasons of unlawful discrimination against Plaintiff for her diverse and protected status under LAD.

289.    As a result of any and all of the aforesaid acts and/or omissions, Plaintiff reasonably believed that the working environment at 54gene was hostile and/or abusive and/or that the aforesaid abuse occurred for reasons of unlawful discrimination against Plaintiff for her protected characteristics of being a Black skinned woman.

290.    The doctrine of *respondeat superior* apply to this Count One of the Complaint.

291.    As a direct and proximate cause and reasonably foreseeable result of any and all of the aforesaid acts and/or omissions, Plaintiff was a victim of conduct that a reasonable person in the same position and diversity would consider sufficiently severe or pervasive so as to alter the conditions of employment and/or create an intimidating, hostile and/or offensive working environment.

292.    As a direct and proximate cause and reasonably foreseeable result of the foregoing, Plaintiff was caused to sustain and will continue to sustain severe humiliation, psychological harm, embarrassment, and anxiety, all of which culminated in her forced resignation.

293.    As the result of 54gene's conduct described herein, Plaintiff was anxious and too intimidated to raise any further complaints about her unlawful treatment while still employed for fear of further retaliation, which is exactly what 54gene did.

294.    In response to Plaintiff's letter detailing Defendants' unlawful conduct, Defendants retaliated and defamed Plaintiff in their fear mongering May 5 Defamatory Letter.

295.    54gene's rebooted United States team targeted Plaintiff to preserve its new single-

hued white team.

296.   54gene's conduct described herein constitutes improper and intentional unlawful discrimination against Plaintiff based upon, and because of, her protected status of being the last Black skinned woman in the United States C-Suite.

297.   54gene's rebooted United States team targeted Plaintiff to preserve its new single-hued white team.

COUNT TWO

*AS AGAINST RON CHIARELLO, TOBI OKE, JENNY YIP, PATRICE MILOS AND YASSINE OUSSAIFI FOR AIDING AND ABETTING UNLAWFUL DISCRIMINATION*

298.   Plaintiff realleges the foregoing paragraphs numbered 1 through 297 as if fully restated and alleged in support of this Count Two.

299.   The Individual Defendants aided and abetted the unlawful discrimination described herein as against Plaintiff, by either harassing her, discriminating against her based solely upon her protected status as a Black skinned female, failing to investigate her claims of harassment and hostile work environment, retaliating against her for complaining about Oke, or collectively all of the above.

300.   The Individual Defendants each violated LAD by engaging in, allowing, failing to investigate and condoning the discriminatory conduct alleged herein.

301.   The Individual Defendants each violated LAD by engaging in, allowing, failing to investigate and condoning the harassing conduct alleged herein.

302.   The Individual Defendants each violated LAD by engaging in, allowing, failing to investigate and condoning the disparate treatment conduct alleged herein.

303.   The Individual Defendants each violated LAD by engaging in, allowing, failing to investigate and condoning the toxic work environment conduct alleged herein.

304.    The Individual Defendants each violated LAD by engaging in, allowing, failing to investigate and condoning the retaliatory conduct alleged herein.

305.    The Individual Defendants served as Plaintiff's supervisors during the above noted unlawful discriminatory conduct, hostile work environment and retaliatory conduct directed at Plaintiff.

306.    The doctrine of *respondeat superior* apply to this Count Two of the Complaint.

307.    The Individual Defendants knowingly provided substantial assistance and/or encouragement to Oke, and each other, in the unlawful discrimination, harassment, disparate treatment, hostile work environment and later retaliation against Plaintiff, depriving Plaintiff of her multilayered protected status under LAD.

308.    The Individual Defendants aided and abetted such discrimination, harassment, disparate treatment, hostile work environment and later unlawful retaliation against Plaintiff, and such is unlawful pursuant to New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq.

309.    The Individual Defendants are liable for aiding and abetting the unlawful, harassment, disparate treatment, hostile work environment and later retaliation alleged herein, all of which are violative of New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(e).

310.    Based upon the allegations herein, the Individual Defendants did in fact aid, abet, incite, compel or coerce the doing of unlawful acts of harassment, disparate treatment, hostile work environment and later retaliation that are forbidden under this act, N.J.S.A. 10:5-1, et seq.

## COUNT THREE

### BREACHES OF CONTRACT AS AGAINST 54GENE

311.    Plaintiff realleges the foregoing paragraphs numbered 1 through 310 as if fully restated and alleged in support of this Count Three.

54GENE BREACH OF THE 2021 AGREEMENT

312.    54gene and Plaintiff entered into a valid and binding agreement on or about September 18, 2021 (the "Agreement").

313.    The Agreement is supported by valid consideration, and Plaintiff has performed all of her obligations thereunder.

314.    The Agreement required 54gene to compensate Plaintiff in the annual sum of USD $330,000 and Plaintiff was entitled to receive a bonus of up to 30% (thirty percent) of Plaintiff's salary constituting a performance bonus.

315.    In full breach of its contractual obligations to Plaintiff, 54gene slashed Plaintiff's compensation from the contractual base of $330,000, by 46.7%, down to $175,999, effective November 1, 2022.

316.    54gene's conduct was unlawful and constitutes breach of the parties Agreement.

54GENE BREACH OF THE 2023 AGREEMENT

317.    Plaintiff and 54gene entered into a contract for the performance of consulting work in March 2023 (the March 2023 Agreement").

318.    The essential terms of the March consulting agreement were agreed upon, and Plaintiff was to be paid $10,000 per month.

319.    The March Agreement is supported by valid consideration.

320.    Plaintiff performed all of the consulting work for 54gene that was required under the March Agreement.

321.    54gene's failure to pay Plaintiff for the consulting work she performed pursuant to the March 2023 Agreement, despite its promises and assurances that it would, constitutes a breach of the March 2023 Agreement.

322.     The terms of the consulting work were definitive, Plaintiff has performed all of the obligations that were agreed to by Plaintiff and 54gene, the consulting agreement is supported by valid consideration, and 54gene's failure to pay Plaintiff constitutes a breach, with resulting damages suffered by Plaintiff.

323.     As a direct and proximate result of 54gene's unlawful breach of the March 2023 Agreement, Plaintiff has suffered damages in an amount to be proven at trial.

*COUNT FOUR*

*DEFAMATION AS AGAINST ALL DEFENDANTS*

324.     Plaintiff realleges the foregoing paragraphs numbered 1 through 323 as if fully restated and alleged in support of this Count Four.

325.     The May 5 Defamatory Letter contains false and libelous defamatory statements concerning Plaintiff (detailed *supra*).

326.     The May 5 Defamatory Letter was published to third parties.

327.     There is no privilege associated with the May 5 Defamatory Letter.

328.     If there was any privileged associated with the May 5 Defamatory Letter, that privilege was waived by 54gene's foreign lawyer when she published the letter to third parties, included defamatory and false statements that were not material or pertinent to the issue to be resolved by Plaintiff's claims sounding in harassing, discriminatory, disparate and hostile treatment or breach of contract.

329.     The May 5 Defamatory Letter was authorized and approved by each Defendant.

330.     Defendants' acts in writing and publishing false statements contained in the May 5  Defamatory Letter were negligent.

331.     Each Defendant here knew that the May 5 Defamatory Letter contained statements that were false in fact and r recklessly disregarded their falsity in their collective choice to defame Plaintiff.

332.     Plaintiff has suffered material reputational damages, suffered the creepy LinkedIn stalking by Chiarello that signals his continued threatening and retaliatory conduct detailed in the May 5 Defamatory Letter, as well as the costs in bringing this separate claim against the Defendants.

333.     Plaintiff has suffered material damage to her reputation, having lies hurled against her, and then published to third party email addresses of 54gene's wealthy Chief Executive Officer and investors.

334.     The amount and severity of the pecuniary harm inflicted by Defendants is known only by Defendants' investors who received the May 5 Defamatory Letter and will be proven at trial.

335.     As a direct and proximate result of Defendants May 5 Defamatory Letter, whose false and defamatory contents are incorporated herein, Plaintiff has suffered damages in an amount to be proven at trial.

*COUNT FIVE*

*VIOLATION OF THE EQUAL PAY ACT (N.J. STAT § 10:5-12) AS AGAINST 54GENE*

336.     Plaintiff realleges the foregoing paragraphs numbered 1 through 335 as if fully restated and alleged in support of this Count Four.

337.     New Jersey law prohibits employers such as 54gene from engaging in violations of its Equal Pay Act.

338.     As detailed supra, 54gene paid Plaintiff, who is a member of multiple protected classes at a rate of compensation, including benefits, which was less than the rate paid by 54gene to white and males for substantially similar work.

339.     The whites and males who received compensation and benefits that far exceeded Plaintiff's compensation and benefits were less qualified, less skilled and has less responsibilities than Plaintiff.

340.     54gene's disparate pay violations was not based upon a seniority system (Chairello was engaged after Plaintiff, and so was He), a merit system (54gene did not have one), and 54gene had no legitimate or bona fide factor other than Plaintiff's female Black skin tone.

341.     The white males who were paid higher compensation did not have more training than Plaintiff, did not have more education than Plaintiff, and clearly did not have more legal experience than Plaintiff did.

342.     54gene had no legitimate business necessity to pay a Black skinned woman less than it paid less qualified white males, and it did so for the unlawful basis of Plaintiff's protected class.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants Ron Chiarello, Tobi Oke, Jenny Yip, Patrice Milos, Yassine Oussaifi, and 54gene, Inc., its agents, servants, and/or employees, and jointly and severally, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New Jersey;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

F.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff as a result of Defendants' May 5 Defamatory Letter in an amount to be determined at trial, plus prejudgment interest;

G.      An award of punitive damages;

H.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

Dated: June 7, 2023                              Brazzano Law PLLC


                                                 */s/Rebecca Brazzano*
                                                 By: Rebecca Brazzano, Esq.
                                                 43 West 43rd Street, Suite 264
                                                 New York, New York 10036
                                                 +1 561 685 3812
                                                 Rbrazzano@BrazzanoLaw.com
                                                 *Attorneys for Plaintiff*
                                                 *Teresia Bost*

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 7, 2023                          Brazzano Law PLLC


                                             */s/ Rebecca Brazzano*
                                             By: Rebecca Brazzano, Esq.
                                             *Attorneys for Plaintiff*
                                             *Teresia Bost*


## DESIGNATION OF TRIAL COUNSEL

Plaintiff designates Rebecca Brazzano as Trial Counsel.

Dated: June 7, 2023                          Brazzano Law PLLC


                                             */s/ Rebecca Brazzano*
                                             By: Rebecca Brazzano, Esq.
                                             *Attorneys for Plaintiff*
                                             *Teresia Bost*


## CERTIFICATION OF COMPLIANCE WITH R. 1:38-7(c)

I certify that confidential personal identifiers have been redacted from documents now

submitted to the Court and will redact from all documents submitted in the future in accordance

with R. 1:38-7(b).

Dated: June 7, 2023                          Brazzano Law PLLC


                                             */s/ Rebecca Brazzano*
                                             By: Rebecca Brazzano, Esq.
                                             *Attorneys for Plaintiff*
                                             *Teresia Bost*

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that to the best of my knowledge and belief, this matter in controversy is not the subject of any other action pending in any Court or arbitration proceeding and to the best of my knowledge and belief there are no other parties who must be joined in this action.

Dated: June 7, 2023                              Brazzano Law PLLC


                                                 */s/ Rebecca Brazzano*
                                                 By: Rebecca Brazzano, Esq.
                                                 *Attorneys for Plaintiff*
                                                 *Teresia Bost*

## VERIFICATION

I, TERESIA BOST, Plaintiff here, of full age, deposes and says:

1.     I have personal knowledge of the allegations of the within Verified Complaint;

2.     I have read the foregoing Verified Complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

3.     The allegations of the Verified Complaint to which this Verification is attached are of facts admissible in evidence to which the affiant is competent to testify; and

4.     I hereby certify that the foregoing statements by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment according to law.

Dated: June 7, 2023

Teresia Bost

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

Pursuant to R. 4:10-2(b), demand is made that Defendants disclose to Plaintiff's attorney whether or not there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or indemnify or reimburse for payments made to satisfy the judgment and provide Plaintiff's attorney with true copies of those insurance agreements or policies, including, but not limited to, any and all declaration sheets. This demand shall include and cover not only primary coverage, but also any and all excess, catastrophe and umbrella policies.

Dated: June 7, 2023                                 Brazzano Law PLLC


                                                    _/s/ Rebecca Brazzano_____
                                                    By: Rebecca Brazzano, Esq.
                                                    *Attorneys for Plaintiff*
                                                    *Teresia Bost*

# Civil Case Information Statement

## Case Details: HUNTERDON | Civil Part Docket# L-000209-23

**Case Caption:** BOST TERESIA  VS CHIARELLO RON

**Case Initiation Date:** 06/07/2023

**Attorney Name:** REBECCA ANNE BRAZZANO

**Firm Name:** BRAZZANO LAW

**Address:** 43 WEST 43RD ST STE 264

NEW YORK NY 10036

**Phone:** 5616853812

**Name of Party:** PLAINTIFF : Bost, Teresia

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** LAW AGAINST DISCRIMINATION (LAD) CASES

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Teresia Bost?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

06/07/2023

Dated

/s/ REBECCA ANNE BRAZZANO

Signed